Thank you, Mr. Court, Counsel. My name is Larry Wishart from Reno, Nevada. I represent Appellant Steven Nye in this case. I'll address initially the sufficiency of the evidence issue as it relates to Count 1, the conspiracy, and state generally that the evidence was insufficient to convict Mr. Nye of the conspiracy as charged, meaning the overall conspiracy, in that the government failed to prove that a single agreement, an overall agreement, existed amongst all the alleged conspirators. The proposed conspiracy was the existence of at least two conspiracies. The first one that I've designated in the briefs as the Uribe conspiracy, which involved Mr. Uribe, Mr. Lewis, Mr. Jimenez, and, of course, Ms. Theodorotis and Mr. Herrera. Although Mr. Herrera and Ms. Theodorotis are mutual to the two conspiracies that we've identified, the other conspiracy involves, at least for purposes of trial, only Mr. Nye, Mr. Herrera, and Ms. Theodorotis. CHIEF JUSTICE BREYER We asked for phone calls. There were two phone calls. I think there were 75 and 76. STEVEN NYE That's correct. CHIEF JUSTICE BREYER They weren't in the record. Do you know whether they've been supplied? I believe Mr. Denny provided those to the clerk this morning. CHIEF JUSTICE BREYER Okay. CHIEF JUSTICE SOTOMAYOR Oh, we didn't get them. CHIEF JUSTICE BREYER Yeah. I know they were short. CHIEF JUSTICE SOTOMAYOR But they were. CHIEF JUSTICE SOTOMAYOR Thank you. Why don't we just wait a minute until we can get those? One copy for everybody. CHIEF JUSTICE BREYER I understand the Court's concern with those, and what I'd like to do is put those within the chronology that I'll go through with respect to the conspiracy and there's a general time frame, which I'll say is from the late summer or the fall of 2002 through probably arrest, which was May 7th, 2003. In the early stages, there's one time frame which is probably from the late summer or early fall of 2002 up until November, and this is a time frame within which the agents, the various agencies, are conducting an investigation. They get wiretaps, authorizations, and that sort of thing, and they're investigating a large number of people, probably two dozen people in two large conspiracies, one being the Uribe conspiracy, the other being the Quiros conspiracy, which was prosecuted separately. Sometime probably in November, Ms. Theodorotis and Mr. Herrera come to the attention of the people who are investigating. This leads to the undercover officers' involvement in the transactions, three distributions to the undercover officer in November and December of 2002. These first three transactions involve only the Uribe conspiracy, the source of the methamphetamine for these three transactions being the Uribe people, so to speak, primarily Mr. Jimenez. Mr. Nye falls into the net eventually in the middle of January of 2003 when there's a January 14th transaction. Mr. Nye is clearly a participant, at least in negotiating and helping to provide the drugs to Mr. Herrera, who delivers these to the undercover officer. The reason for this is the undercover officer was arranging for this distribution with Ms. Theodorotis while she was in the hospital delivering a child. Also within this segregated time frame is the February 14th transaction for which Mr. Nye clearly provides the methamphetamine and the March 5th transaction for which Mr. Nye provides the methamphetamine. Then we go essentially to another time frame following the March 5th transaction. Even though the March 30th telephone conversations fall into that time frame, I'll get back to those. There's a March 22nd transaction, and once again this goes back and involves only the undercover officer. I believe I mistakenly put in the reply brief that the March 22nd transaction was a delivery to Mr. Olivas. This is incorrect. The March 22nd transaction, I believe, was the last transaction that was charged as a substantive count, which was count 7 in the indictment, and the last transaction that involved the undercover officer. There were then two transactions in April. One, I believe, was April 5th, which involved the Uribe conspirators only, and was a delivery to Mr. Olivas, I believe, of four pounds. And then another transaction later in April that once again involved only the Uribe conspirators. This was once again a delivery to Mr. Olivas, Mr. Jimenez being the primary source, the primary mover on this transaction, Mr. Herrera being involved in the delivery. Now, in essence, there's no connection of the Uribe conspirators, meaning those who are distinct from Mr. Herrera and Ms. Theodoratos, to the transactions involving Steve Nye. There's no evidence that the Uribe people depended in any way or were interdependent with Mr. Jimenez in any way. Now, in essence, there's no connection of the Uribe conspirators to Mr. Nye for the success or the benefits from the transactions involving the Uribe people or vice versa. Mr. Nye had no knowledge of the existence of the Uribe people, nor was he dependent on the success of their efforts through Theodoratos and Herrera or anybody else for both these distinct and separate conspiracies. And but Herrera was involved in both. Both Mr. Herrera and Ms. Theodoratos were involved in both conspiracies, Your Honor. That's correct. Now, doesn't the – I think you mentioned earlier that there has to be an agreement among all of – I think, for example, Mr. Nye didn't really have to know of the existence of the other people, did he? Just a slight connection is sufficient. Well, a slight connection is sufficient, but the connection has to be with respect to the activities of the conspiracy. For instance, he might have – hypothetically, he might have known about Mr. Uribe and Mr. Libas, but if he only had knowledge of their existence and there still was no codependency between the two groups for the success of their ventures, then there's still not a slight connection, merely knowing or knowing of. I mean, the fact that he didn't know or know of these people is just some circumstantial evidence that there was not a slight connection, and vice versa, the fact that they had no knowledge of him, which is illustrated by Mr. Libas, may not carry the day as showing no connection, but it's certainly evidence that there was no connection. There was one incident, for example, that Nye was asked to supply a pound of methamphetamine and Nye offered a price for the product in coded language. Herrera ended up purchasing the meth from another supplier. Wouldn't that have put Nye on notice that there were others involved in this overall conspiracy to get whatever amount was required to the buyer? Well, I don't know that Nye was not aware that Mr. Herrera may have had other suppliers. I don't know that he was. I don't know that there's evidence in the record that makes it clear that he was aware of that. But once again, even if he was aware of that, if he was not connected to those other suppliers in any way, if there was no mutual dependence for success or benefits, merely knowing that there's another conspiracy out there doing the same thing that has the same generic goal, and that's to sell methamphetamine and make money, does  it make any sense to you that Mr. Herrera was not aware of the other suppliers   Mr. Herrera was not aware of that. Except all of them were going through Herrera. All of them were going through Herrera. Well, Herrera was involved in deliveries, both for Uribe and for at least a couple of the Nye-involved transactions. He became involved in deliveries for Mr. Nye because Ms. Theodorotis had originally used Mr. Uribe and Mr. Jimenez as a source, and she had developed a custom of assuring her immediate cover costs. So, yeah, Mr. Herrera was somewhat of a connection in that he was involved in conspiracies and deliveries. Why wouldn't the instance that I mentioned to you be a legitimate inference that the jury could have drawn that there were more involved in this conspiracy with Herrera than just Mr. Nye and that he knew about it? Well, I think the jury could have drawn a reasonable inference that there were more people involved than Mr. Nye because Mr. Nye apparently had a source, but there's no evidence that connects Mr. Nye with the Uribe conspirators. I mean, that's really the crux of the problem here. Aren't there cases that, obviously, if you're procuring drugs, they're coming from somewhere, but that that alone – and that somewhere you may know is not actually your supplier because he has to get it from somewhere, but that that alone doesn't give you a legal link? Well, I mean, that's what I understand, is that you have a chain of supply, and in this case, you have a chain of supply in what I call the Nye-related conspiracies and the Uribe conspiracy, but it just – it never connects with the Uribe conspiracy. There's no – there's no inference that connects. Except through Herrera. Well, they only connect personnel. They don't connect activities. Mr. Herrera – Well, supplying – supplying drugs to Herrera. Well, Mr. Nye supplies drugs to Herrera to deliver to the undercover officer. The Uribe conspiracy supplies drugs to Herrera and to Peter Ross to deliver to both the undercover officer and to Mr. Olivas, but once again, there's – there's no connection in that there's no dependence between these – between these two distinct groups. Mr. Nye is not relying in any way for his success or his benefits on the success or benefits that may be derived from the Uribe conspiracy and vice versa. But Mr. Herrera is – is relying on – on supplying from various – these two sources, and it was all within a significantly short period of time. That's correct. And Mr. Herrera, therefore, along with Ms. Theodoratos, is a member of both the Uribe conspiracy and the Nye-related conspiracy, but he's not a member of an overall single conspiracy that includes the Uribe people and Mr. Nye. Mr. Herrera certainly is – is a member of two different groups, but they're two distinct groups, not one large group. And I think, really, this is – this is why is that? Why isn't there a legitimate inference for the jury that it is one large group rather than two distinct ones? And the jury was instructed on that. Well, because there's no evidence that there was one – that there was a connection between these two groups. There's no evidence anyplace that Mr. Uribe, Mr. Jimenez, Mr. Olivas, or anyone else in the Uribe group relied or was interdependent with Mr. Nye for the benefits and success of their group, and there was no evidence in the record that Mr. Nye was dependent in any way on the Uribe people for the success and benefits of the distributions in which he was involved. They were – they were simply like two sources of suppliers to Toys R Us for toys. Mr. Nye supplied on – on two or three occasions, and Uribe, Jimenez, and his people supplied on other occasions. But they – they didn't meet. There was – there was no backflow. None of the money, for instance, that Mr. Herrera and Ms. Theodoradis got from the Uribe-related conspiracies went back to Mr. Nye. None of the money or – or whatever benefit they got from – from the distributions involving Mr. Nye went back to Uribe, Jimenez, and those people. So certainly, Mr. Herrera is – is somewhat not a connection, but he's – he's a person who's mutually involved in both conspiracies, but the conspiracies do not connect through him. They – they actually – they dead-end at him and Ms. Theodoradis. What about these two phone calls? I just looked at them. They look like Herrera's calling up Nye and asking – and they're talking about Nye purchasing from Herrera, where her – Well, and I don't – I don't doubt, and I think those – those telephone calls, candidly, are probably indicative of some ongoing, at least – I could say it's just talk because there's no transaction to support that they did anything, but certainly the talk suggests that they were considering further transactions between them – between themselves, between the two of them. But I really think that this – this kind of helps to define the distinction between these two groups because you have a Nye-related transaction on March 5th, and I think there's reference to this in the phone call when they're talking about something that happened about three weeks ago. Between the – the transaction of March 5th, you have the transaction of March 22nd. And this is – this is set forth in the indictment, including the overt acts, and then supported by the testimony of a number of people. And it's very clear from the – from the cumulative testimony that Mr. Nye was in no way a participant in the March 22nd transaction. So while Mr. Herrera and Mr. Nye are continuing to have discussions, at least during this timeframe, the Uribe conspiracy, including Mr. Herrera's involvement, continues to go forward with its own separate conduct. Then you have the March 30th conversations. There's no evidence of any transaction. Nothing appears to have occurred. But very shortly following this March 30th telephone conversation, you have another transaction on April 5th, which I believe is for four pounds. And this, once again, is distinctly Uribe. This is Mr. Olivas ordering from Mr. Uribe and arranging delivery and payment through Mr. Jimenez and Mr. Olivas. There's no – and what's interesting here and why I say this defines the distinction between the two groups is because in this – in this timeframe between March 22nd and April 5th, when you have two significant transactions involving Uribe people only, you really don't have any discussion between Mr. Nye and Mr. Herrera about what's going on with this transaction or that transaction. You don't have Mr. Nye suggesting that he should be getting a take from either one of these. And then you go forward to the last transaction, and these two April transactions are not over at – or, excuse me, they're not substantive counts in the indictment. But you go forward to the last transaction in April, and once again, this is distinctly Uribe. Mr. Olivas testifies once again that he orders drugs from – through David Uribe, through Mario Jimenez, and they're delivered and paid for in that fashion. Once again, there's no evidence, despite the wiretaps and the surveillance and other investigative procedures, there's no evidence that Mr. Nye is involved in any way in these – in these April transactions with Mr. Olivas. So you have this – you have this conversation sandwiched in between very significant one-pound and four-pound transactions of the Uribe conspiracy. There's no benefit, no connection, no knowledge, nothing there that suggests a connection between Mr. Nye and Uribe, because he and Mr. Herrera are acquainted and continue to have conversations about possible future separate transactions. If you're wrong, then anything that Jimenez and Uribe sell to anybody through Herrera, Nye's going to be responsible. So the amounts of drugs – and that's really what drives this whole issue, because you're not even challenging 5 and 6. So it's really whether – basically whether this is a guideline range of 97-something months or 151-something months. Absolutely. And I believe, you know, Judge McKibben sentenced Mr. Nye to the guidelines and sentenced him to the statutory minimum. But the statutory minimum and the guidelines go down significantly if Mr. Nye is sentenced on counts 5 and 6, rather than on 5 and 6. Let me ask you on the sentencing issue about the safety valve. It seems that if you take his statement liberally, that he supplied everything but the name. Is that correct, an offer to supply a name? Or is there more? He offered through me, and I would have to take some heat for not being as familiar with what the safety valve required, as I should have been. He provided a statement in which he disclosed more. Certainly, he didn't testify at trial, and he had never been debriefed. So he disclosed – made a disclosure in writing and offered to make himself available for either written questions or otherwise to comply with sub F and also to provide the name of his source if the court instructed him that he was required to do so. And it appears clear to me now that he was required to do so without the court telling him so. But I was not aware of that at the time. I had literally been set up until the time of sentencing, and then in preparing my brief, I ran across a couple of cases with some consternation and a little bit of amusement, I suppose, that told me that I should have done more to make Mr. Nye available for safety valve. But I still think that he did satisfy the safety valve by providing a statement and agreeing to be made available for further debriefing. Alito, but you also limited it to only written questions. I mean, you were really trying to control it. No, I wasn't. No, you said you'd be glad to answer – you'd be glad to submit to their inquiry pursuant to written questions, I think was the last part of your letter. Or otherwise comply with sub F. In other words, I was proposing alternatives. I wasn't saying you have to do it this way. I was suggesting that you could do it, you know, this way or some other way. It did seem that the district court was a little uncertain about whether this mattered. Didn't he make some comment about, well, this is how I'm going to do it in the court of appeals. If I'm wrong, the court of appeals will tell me and then we'll be back where we started. So it seems that it's – it may not be precisely clear in the Ninth Circuit when and how and what's required. But are you abandoning this argument now? Are you – No, I'm not abandoning the argument. Okay. I'm being candid in saying that I've been looking back and I'm reviewing cases since sentencing that I realize that maybe I could have taken some additional steps, but I still believe the steps we took were sufficient and that they did provide a disclosure and offer to make Mr. Nye available. I can't force the government to accept that. And that did meet at least as set out in the guideline that you can do that up through the time of sentencing. Well, I interpreted or looked at the guideline language literally, and it said to me up until the time of sentencing, and that's the path I followed. But we don't have to reach that issue if we agree with you on the conspiracy issue, because it would be resentenced, and then you could – Well, that's my take on it, and that's why I haven't really spent any time on the 404B or the 801D2E arguments, because I think those are, frankly, moot. And if you do agree with Appellant on the conspiracy issue, you would essentially – It's going to go back anyway. That's 506. I'll let you have it from the government, then. May it please the Court, Counsel. My name is Craig Denny. I'm an assistant United States attorney representing the Appellee United States. Your Honors, with reference to the crux of the Appellant's argument dealing with the single-versus-multiple conspiracy argument, Mr. Herrera was the integral part of the conspiracy in the way the government presented the case for the grand jury indictment as well as the trial presentation. The government would acknowledge the defendant's multiple conspiracies argument, assuming the fact that things stopped after the March 5th drug transaction with Mr. Denny supplying the drugs to Mr. Herrera, ultimately the drugs going to the undercover officer. However, the thing that the government found to be significant, and when we presented the case as a single conspiracy, is that this one-pound transaction that took place on March 22nd of 2003, this is the argument that the defense is saying, well, Mr. Nye is not involved anyway in the phone calls or the one-pound being delivered by Mr. Herrera to the undercover officer and the source of the drugs, and appeared to be Mr. Jimenez on that date. However, approximately one week after that takes place, we have these two telephone calls on March 30th, 2003, where we have Mr. Herrera and Mr. Nye talking in code language, and it does appear to be that Mr. Herrera is offering to sell pound quantities of methamphetamine to Mr. Nye, priced at $4,000, the price being sold to the undercover officer who is not a fellow trafficker within the conspiracy, was $4,500. Then go approximately another week after that to April 15th, 2003, then we have Mr. Herrera delivering four pounds of methamphetamine via Mr. Uribe, Mr. Jimenez. Those drugs ultimately go to Mr. Olivas. The sequence of those three transactions where we're involving pound quantities of methamphetamine showed that this defendant, Mr. Nye, was involved in the single conspiracy to distribute methamphetamine in this case. I guess I have to say why. I mean, I understand. You know, I try to add little charts of these people, and I'm sure you do, too, and how they intersect and the hub and all those things. But you have one conversation, but I'm still hard-pressed to figure out how that conversation is sufficient to make an overarching conspiracy with Uribe. Here is the government's theory on that, Your Honor. The case law, particularly the Kenney case of the Ninth Circuit, talks about that there has to be some type of rim to bind the spokes of the wheel together. And it talks further that the circumstances lead to an inference that some form of overall agreement exists, showing that each defendant knew the scope of the conspiracy and had reason to believe that his own benefits were dependent upon the success of the venture. Well, in this case, those two phone calls on March 30th, 2003, with Mr. Herrera and Mr. Nye, are clearly putting Mr. Nye on notice that there's other individuals involved in this conspiracy, and that these pound quantities of methamphetamine can be brought from Mr. Herrera to Mr. Nye. We have the transaction of one pound between Mr. Jimenez and Mr. Herrera one week prior to this phone conversation taking place. Then we have a four-pound transaction taking place one week after those two phone calls with Mr. Nye and Mr. Herrera. So the government's position is that Mr. Nye was well aware that there were other individuals involved in this drug conspiracy to distribute methamphetamine aside from Mr. Herrera and his girlfriend, Ms. Theodoradis. There were other individuals providing the pounds of methamphetamine. They were ultimately going out to the undercover officer on March 22nd. We don't have further evidence to show the transaction as it took place after the March 30th phone calls. But we did find that another four-pound transaction is taking place through Mr. Herrera to Mr. Olivas on that date. So the government's position is this ring is the inference that we're trying to show that this ring shows a single drug conspiracy taking place. We're applying the facts, the timing. We have essentially a conspiracy that's taking place at approximately about a nine-month period of time. The location, they're taking place primarily at the transactions in the district of Nevada, northern district of Nevada. There's the one transaction that takes place in Truckee, which is geographically not far from Reno, Nevada area where the other transactions took place. The persons involved, essentially six individuals are alleged or named as the conspirators in this single conspiracy. And then the government laid out the 24 overt acts that the grand jury indictment returned. We presented evidence to support each and every one of those acts. Out of those 24 acts, eight of the acts, Mr. Nye was directly involved in the conspiracy. It wasn't just simply starting in January and ending on March 5th. We have him going on these other phone conversations with Mr. Herrera down to March 30th. And the reason that's significant is we suddenly are dealing with pound quantities of methamphetamine with the undercover officer on the 22nd, conversations with Mr. Nye on the 30th, and then the four pound transaction taking place on April 5th. And tell me what's wrong with this scenario, that Herrera is selling. Herrera and his girlfriend, Theodore Dorados, are selling. And they get it from Jimenez. They get it from, let's see who else they get it from, Olivas. And on a couple of occasions, they get it from Nye. Right? So far so good? Yes, sir. Okay. Now, then you get the 30th. The calls on the 30th are inconsistent with that scenario because on the 30th, the calls are about Herrera selling a pound quantity or, well, selling methamphetamine to Nye. And then Nye calls him back and says, well, how much would a pound be? So in all the rest of the case, Nye is pitching in as a supplier to Herrera when Herrera doesn't get it from any place else. And then Herrera calls Nye up and says, well, do you want some yourself? So doesn't that show, that shows a relationship between Nye and Herrera. But how does it show that Nye has anything to do with the other people? Your Honor, the government's position is that shows that rather than a traditional supplier to the trafficker of a relationship, the drug is going back to the trafficker. Right. So the drug is going back to the trafficker, but the drug is going back to Mr. Herrera. So the drug is going back to Mr. Herrera. The drug is going back to Mr. Nye, supplying him on certain transactions individually that go to the undercover officer. However, the drugs are flowing back from Mr. Herrera to Mr. Nye, showing him that there are other individuals in this conspiracy. Well, other than those phone calls on the 30th, is there any other evidence that Nye has anything to do with the other people? I don't believe so, Your Honor. Because Nye was sort of a – it kind of reminds me that when you, you know, you go to your favorite Chinese restaurant and they're closed, you go to another one and you get Chinese food. But that doesn't mean that the two Chinese restaurants are in a conspiracy to keep me filled up on Chinese food. I understand that analogy. However, in the – My biggest concern is, if you're right, and answer this, if you're right, if Jimenez sells 1,000 tons of methamphetamine, I mean, to make it the biggest methamphetamine transaction ever, doesn't Nye go to jail forever because that's part of the conspiracy? At some point, I think you can – you can draw the analogy or create it to a preposterous level. In this case, however, if you consider just taking a snapshot of the 30th – I'm sorry, March 22nd, March 30th, and April 5th, they're showing that Mr. Nye knows that there are pounds of methamphetamine to be sold. He, in the past, has been providing these quarter-pound quantities to Mr. Herrera. However, the drugs are flowing backwards with Mr. Herrera saying that we can all – I can provide you with a pound of methamphetamine for 4,000 pounds. But Nye never takes it. I mean, it's just talked. Well – And there's no – and you say – and you can't believe it. There's no other talk. They had a wiretap, and there's no other talk of Nye being offered to purchase or Nye purchasing. Correct. But what we need to prove is a slight connection to the conspiracy and this overall goal of him to benefit from it and understanding the scope. Mr. Nye understands the scope of the conspiracy because Mr. Herrera is telling him, I can get you a pound of methamphetamine in pound quantities for – But he never – but on that, he never agrees. I mean, the deal – he never – there's no agreement. It's just talk. Well, he tells him in the second phone call, you know, the situation is not called max, he's not priced. He tells him the price, and there's sort of some veiled language where he's on the back burner. But they never agree, do they? He never says, if you get it, I'll buy it. So he never agrees to possess it. That's one take on it, Your Honor. I think in a – when we're trying to prove up these overt acts in a drug conspiracy, Well, let me ask you. I gave you the question with the tons. Say there were 100 pounds of methamphetamine sold in late March by Jimenez. Would Nye be liable for that? If we could establish his connection and knowledge of the quantities that are being dealt to us – Say Herrera goes, you know, now Customs is investigating, and Customs says, oh, we've got this guy Herrera. You know, a lot of times, one agency doesn't know what the other one's doing. And they say, Herrera, do you sell methamphetamine? And they say, yes. And he says, well, we only buy large quantities. We want 100 pounds of methamphetamine. Can you get that? And Herrera goes back to Jimenez, and Jimenez says, yeah, we'll make up a batch. So they make up a batch, 100 pounds of methamphetamine. Herrera delivers it to the Customs undercover agent. Is Nye liable? I would say that it would be more difficult argument to make. However, the facts that are in record – Why would it be more difficult? Because if you're talking about a one-pound transaction that they're discussing and then suddenly we're escalating it to 100 pounds, I don't think that goes along with what took place on March 22nd with Mr. Jimenez. Sale is 10 pounds, 5 pounds. I think if you're getting down to smaller pound quantities, yes, sir, I think you could make the connection. But doesn't everybody know that someone's making methamphetamine and that they're going to make it in more than small quantities? But it's not just being aware that someone's making it. There's actually communications of Mr. Herrera offering to sell it to Mr. Nye. That's the difference that I have on the evidence and how it's interpreted. And the juries was instructed on the defendant's multiple conspiracies argument as well as the government's single conspiracy argument. I understand having to consider the evidence to prove each and every element of the conspiracy and the defendant's participation. The government believes that we submitted it as a – approved a single drug conspiracy. Let me ask you about that. And that's why I'm glad we have the phone calls because they're somewhat important. Say they made up 100 pounds of methamphetamine before the phone call. And now Jimenez says to Herrera, look, we've got all this methamphetamine. See what you can do. And Herrera calls up. And then these phone calls take place, exactly as is. Is – and then they move in and they bust them and they get the 100 pounds of methamphetamine. Is Nye liable for the 100 pounds of methamphetamine? I think potentially, yes. He's purchasing the methamphetamine to continue his sales of it. But no, just limit it to what you have. I mean, that's why I said not to change any hypothetical or anything. But the express language of the phone calls. Is Nye liable for the 100 pounds of methamphetamine? It could be for showing his knowledge and his intent. He's going in to form an agreement and his intent to help distribute the methamphetamine, yes. Assuming for purposes of argument, Your Honors, there's essentially a two-step analysis that the Court is going to look at. I mean, this is what I think concerns me. The small-time, two-bit methamphetamine supplier or buyer does the time that the manufacturer of the methamphetamine. Any small-bit, two-bit player in the methamphetamine, the person who's selling it in little bags on the street, is liable for all the methamphetamine that downstream someone manufactured, even though he has no connection to them? I don't think that's the scenario with Mr. Nye and Mr. Guerrero. We're talking individuals dealing in quarter-pound quantities of methamphetamine, pound quantities, not someone selling an eighth of an ounce or an eighth ball on the street. Looking strictly at the three transactions that Mr. Nye – and this is going to my argument – if the Court found that there was a variance between the evidence in the superseding indictment and the evidence presented in the trial, was there actual prejudice requiring that the count be reversed? Mr. Nye acknowledges that he supplied the methamphetamine to Mr. Guerrero on the January 14th transaction. Well, but that wasn't before the jury, was it? I mean, I – you're right. In his 5C1.2 letter, he says that, you know, he told him where to get that methamphetamine. But that – the jury didn't know that. Well, we did present evidence of – we didn't have the wiretap up at that point, but we did have phone tolls for Mr. Guerrero, multiple calls going back and forth between Mr. Nye and him. On that day? Yes. But none of those calls indicated that they – that, number one, they were connected, or, number two, the length of the calls, because they asked the agent who was testifying about the toll records, and he didn't have the information about how long the calls were. Correct. But the transaction that took place, there were – the toll or toll records showed the pattern of calls taking place on that exact day. Once the wiretap – I'm sorry. Then the February 20th transaction takes place where Mr. Nye is surveilled and we find him. But you have actually – it isn't until February 20th that you actually have Nye in a transaction that was presented to the jury. Is that right? Well, we – well, in the actual transaction, other than we have – we're raising the inference through the phone records between him and Mr. Nye. Because there were phone records. Right. But those were only calls to Nye. They weren't calls from Nye to Herrera, right? There were six. So you don't know that – that Nye ever got the call. I mean, we know later on, but the jury didn't know. So in other words, the agent – But you're hearing – you're actually hearing the real calls that take place. It's showing the – I mean, you're making a reasonable inference from the evidence considering the light most favor of the government. We're showing where the source of the methamphetamine is coming for on that January transaction, February, and then the March 5th transaction. I believe that's when they – there was an error of the quantity and there were those calls. I mean, say – say you get the third one, you know, so that there were three. So go ahead. If you look at the actual, the pure weights of methamphetamine, in just those three transactions, you have 55.9 grams of pure methamphetamine, which, purposes of the conspiracy, is a mandatory minimum 10 years' sentence. But can I ask you about – about that? Because I was thinking about that. There's no finding. I looked, and the verdict sheet isn't in here, so I can't tell. When I do it, I have to make an actual finding on the verdict sheet. But if the conspiracy count doesn't stand, you're right. If he's – if you take those three transactions, the actual weight of the methamphetamine would put him over the mandatory minimum 10. But there's no finding by the jury on that. Well, one of the evidence – one of the elements in the conspiracy count was to prove in excess of 50 grams of pure methamphetamine. That was one of the elements. Well, but then that gets back. If you lose on count one, if there's not enough evidence for the jury to convict on count one, then he's only liable for counts five and six. The jury never made a determination as to the total weight of the methamphetamine that he was involved with to bump up his sentence. But he was charged in count one that it was either 500 grams or more of a mixture of 50 grams pure. So that's – that is the – what they convicted him of. It wasn't just a found of an unknown quantity. Well – But if that fell out. Yeah, that's the problem. If that fell out, then what are you left with in terms of proven quantity? Well, then it's just the substantive counts that he was convicted on. On five and six? Yes. Which is a mandatory minimum five and guideline range 97 or something. Correct. And the government's argument on the issue of prejudice, if there was prejudice that was taking place, some of the case that I provided to the Court in the 28J letter, the all-red case out of the Eleventh Circuit that talked about, a case where we actually have a conspiracy that they show that there's a variance between the allegations and the indictment and the proof that's shown at trial. There was some evidence that the co-conspirators in that case at one point were competing against each other, and the Court considered some factors in the all-red opinion where they talk about, well, if defendants in that case was concerned about some type of prejudice or some type of spillover effect of the evidence, there was no motion to try to sever these other defendants out. And in this case, there was no motion by defense to try to sever out Mr. Jimenez or Mr. Olivas. And in fact, the government at trial sort of streamlined the evidence. We had, you know, hundreds of wiretap calls. We were going to play quite a few, but when Mr. Jimenez fled right before trial, we focused the evidence to simply proving up the 24 all-red acts in the superseded indictment to show what did Mr. Montanay do, what did Mr. Herr do. And that was limited. In hindsight, I can see maybe that more evidence would be better. But with respect to multiple conspiracy, multiple conspiracies versus single conspiracy, I would submit my brief adequately addresses the rest of that. Does the panel have other questions on the other issues? No, I think the other issues are well briefed. Thank you very much. Thank you. You're in the hall, but since we went over there, we'll give you about another minute. One minute. I only want to address a couple of things. And generally speaking, frankly, if the government could have proven a connection between Mr. Nye and the Uribe conspiracy. No, you're at 241. No, a minute. Do you have some left? No, no. Okay, there you go. Thank you. So they had wiretaps, surveillance, and more importantly, they had the testimony of Annette Theodorotis, who certainly, if there was anything more than conversation involved between Mr. Nye and Mr. Herrera and other transactions or any connection that would have put Mr. Nye together with Mr. Jimenez or Mr. Uribe, Annette Theodorotis certainly could have testified to that. I'm somewhat puzzled at what I construe as the government's attempt to connect the March 30th conversation with the March 22nd transaction. There was abundant evidence that only Mr. Jimenez and Mr. Herrera were involved in that delivery. That was surveillance, testimony of Russell Carter. But most importantly, on cross-examination, Ms. Theodorotis, the second time I asked her, agreed that the source of the March 22nd meth was Mr. Jimenez and testified twice that Mr. Nye had absolutely nothing to do with the March 22nd transaction. Thank you. Thank you. Thank you. Thank both counsel for your arguments. It's been very helpful. Case of United States v. Nye is submitted and we're adjourned for the morning. This court is adjourned. Thank you.
judges: Hug, McKeown, Moskowitz